UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2015 OCT 29 PM 3:11

| | | |
|---|---|---|
| Kenneth Garcia,<br>Judith Fadul,<br>Yazmin Delarosa,<br>Brandon Delarosa,<br>Randy Delarosa,<br>Celeste Crespo,<br>  Plaintiff's,<br><br>v.<br><br>City of New York,<br>Michael Smyth,<br>David Rojas,<br>Patricio Ovando,<br>Greg Larson,<br>  Defendant's. | * * * * * * * * * * * * * * * * * * | Case No. 1:15-CV-07470-UA |

AMENDED COMPLAINT
PURSUANT TO RULE 15(d)

1. This Civil Action is authorized by 42 U.S.C. § 1983 to redress the deprivation, under color of State law, rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. § 1331 & § 1343(a)(3). Plaintiff's seek Money damages by way of compensation due the injury and the effect said injury has had on our lives. This Amended Complaint comes pursuant to the Fed. Rules of Civ. Proc. Rule 23 (Class Action). This claim has stated and shown injury under the general rules of pleading. Rule 8(a), showing entitlement to relief for all plaintiff's and a demand for said relief sought. The same occurrence was experienced by all in this action, (Multiple Plaintiffs), against the same Defendants, in which qualifies as a Class Action.

2. The Southern District of New York is an appropriate venue under 28 U.S.C. § 1391(b)(2), because it is where the events giving rise to this claim occurred.

## PLAINTIFFS

3. Plaintiff, Kenneth GArcia, on behalf of the above referenced Plaintiff's moving under Rule 23 (Class Action). Mr. Garcia is presently confined within the Bureau of Prisons, Butner FCI-2. Mr. Garcia and Judith Fadul are presently incarcerated, all other Plaintiffs are presently living in New York. The location on record will soon not exist due to an eviction coming very soon.

## DEFENDANTS

4. Defendant's, City of New York, Police Officer's (Detectives), Michael Smyth, David Rojas, Patricio Ovando, and Greg Larson. These Officers work for the New York City Police Department. Each Defendant is being sued in his individual and Official Capacity, at all times mentioned in this Complaint (Amended) acted under the color of State law. The City of New York is responsible as the Respondeat Superior.

## FACTS

5. This Amended Complaint is simply to add additional information that will show a significant question of law as it pertains to the Complaint against the above defendant's. IN support of all of the original claims made against the Officers, this Amended complaint brings copies of an opinion and order from a Federal Judge pertaining to a Suppression hearing held on or about 4/18/2014.

This record shows the fact that not only were lies brought to the surface of events, there were also noted within the attached Exhibits, a pattern of misconduct and conspiracy of all Defendant's in this action. It is noted within the record that the police officers lacked an "objective reasonable basis to conduct a protective sweep." The Court is respectfully requested to focus on Page 29 of the attached, the Footnote in subsection 7. This clearly defines the inconsistent statements and the Civilian Complaint review Board (CCRB)'s decisions.

2

## LEGAL CLAIMS

6. Plaintiff's reallege and incorporate by reference paragraphs 1 - 5, unless otherwise stated, the following legal claims are undisputed.

7. The Non-consensual, warrantless search, false arrest and unreasonable search and seizure violated plaintiff's Kenneth Garcia, Judith Fadul, Yazmin Delarosa, Celeste Crespo, Brandon Delarosa, and Randy Delarosa's rights and constitute not only a due process violations but it also brings into the question of the Fourteenth Amendment to the Constitution. Plaintiff's have the right to be free from unreasonable searches and seizures under the Fourth Amendment and the Fifth.

8. Plaintiff's have no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff's have been and will continue to be irreparably injured by the conduct of the Defendants, unless this Court grants the relief which Plaintiffs seek.

9. The credibility of Detective Smyth's story about Randy breaking down the hallway was contrary to Crespo's testimony and Fadul's sworn declaration that Randy was not even present during this illegal search.

10. The undisputed Fourth Amendment violation has been established where "the reasonableness of the manner in which a search or seizure is conducted." Plaintiff's make the claim that Defendant's failed to act with any reasonable mind. The record reflects support of all legal claims made within the original filing. This Amendment to the above case number is specifically to allow for the addition

of the Affidavit of Celeste Crespo and to take into consideration the Second Circuits position on punitive awards against an individual police officer. **Payne v. Jones**, 696 F.3d 189 (2d 2010). Awards of $125,000 to $175,000 as substantial, **King v. Macn**, 993 F.2d 294-99 (2d 1993).

11. Plaintiff's will adjust the compensatory amount of damages requested in the original complaint and said adjustment is requested to reflect for the record the exact amount requested.

The State Law Tort of intentional infliction of emotional distress has four elements; (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury, and (4) severe emotional distress, see **Hewell v. New York Post Co.** 81 N.Y. 2d 115 (1993), & **Murphy v. American Home Products Corp.** 58 N.Y. 2d 293, 303, 461 (1983)("So outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society]"). In **Gentile v. County of Suffolk**, 926 F.2d 142 (2d 1991), This Circuit "sustained an aggregate jury award of $150,000 for police misconduct that resulted in several days of wrongful confinement and the pendency of criminal charges - also was reduced to $50,000, a compensatory award of $150,000 for loss of liberty that lasted several hours of one night id. at 1350-53. **Garner** noted several New York cases that had upheld smaller awards for wrongful detentions lasting no more than one day, id. at 1353 (citing **Malte v. State**, 125 A.D. 2d 958 (Th, Dept. 1986)($125,000 award reduced to $35,000 for ten hours of detention. Mr. Garcia would make the

Claim in support of all other Plaintiff's that the relief requested as Amended will be $250,000 U.S. Currency due to the fact that this case surrounds detention due to the police misconduct for a period of just over 5 months confinement. Judith Fadul, a Plaintiff in this matter was forced to experience a hardship while on home detention for around 7 months, where she was not able to attend to the normal activities that responsible mothers go through daily.

12. That the above Defendant's are at all relevant times, detectives employed by the NYPD, they are all named here in their official and individual capacities. Defendant, City of New York ("Defendant City"), is a municipal corporation existing by virtue of the laws of the State of New York.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff's respectfully prays that this Court enter judgment granting Plaintiff's:

13. A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

14. Compensatory damages in the amount of $250,000 against each defendant, jointly and severally.

15. Punitive damages in the amount of $50,000 against each defendent.

16. A jury trial on all issues triable by jury.

17. Plaintiff's cost in this suit, and any additional relief this Court deems just, proper, and equitable.

Dated: 10/20/2015

*Kenneth Garcia*

Respectfully submitted,
Kenneth Garcia #91977-054
Federal Correctional Complex
P.O. Box 1500
Butner N.C. 27509

Exhibit

burden of showing either valid consent to enter or a proper protective sweep thereafter, Defendants' motion to suppress must be granted. *See United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (stating that the burden of showing that a search "fell within one of the exceptions to the warrant requirement is on the government").

The Court finds that the Government has failed to carry its burden of justifying the search as a lawful protective sweep, and thus does not reach the question of whether the initial entry was in fact based on valid consent. As an initial matter, the Court declines to credit Detective Smyth's testimony about R.D. — namely, that upon seeing the police enter the Apartment, he made a break down the hallway and tried to close the door to Bedroom 1 — or the other officers' testimony to the extent it is consistent with Detective Smyth's. The Court does not reach that conclusion lightly, but does so for several reasons in addition to an assessment of the witnesses' demeanor.[7] First, as discussed above, Detective Smyth's testimony on that critical issue was

---

contraband in Bedroom 1. (Mar. 13, 2014 Tr. 6-7). And the police procured the search warrant based on what they had seen during their earlier search. (GX 15).

[7]    Significantly, this is not the first case in which colorable questions have been raised about the conduct and credibility of some of the officers involved in the search. At the time of the hearing, Detective Larsen had been placed on modified duty under suspicions of perjury in connection with a narcotics arrest in July 2012, based on apparent inconsistencies between his testimony about the arrest and video surveillance of the same event; Sergeant Ovando was under investigation in connection with that same arrest, for failure to properly supervised Detective Larsen by signing off on certain arrest-related paperwork prepared by him. (Letter from AUSA Edward Diskant, Dec. 18, 2013, at 1-3 ("Diskant Letter") (filed under seal); *see also* Tr. 82-86, 148-51, 196-202, 263-68, 285-89, 301-02). Presumably as a result, the Government did not call Detective Larsen as a witness at the hearing. In fact, the Government advised that, if called as a witness, Detective Larsen "would be likely to invoke his Fifth Amendment privilege" about the incident. (Diskant Letter at 2 n.1).

In addition, the Civilian Complaint Review Board (the "CCRB") found that, in connection with a narcotics arrest in August 2012, Sergeant Ovando and Detective Rojas had unlawfully engaged in a warrantless search of an apartment that they had claimed was based on consent. (Diskant Letter at 3-4; *see also* Tr. 268-74, 282-85, 291-95, 297, 297-300, 412-29; GX 31). Even more significant for present purposes, the CCRB found that Detective Rojas gave a "false official statement" in his interview about the incident when he denied having entered the arrestee's bedroom. (Diskant Letter at 4; *see also* Tr. 416; GX 31-32). These incidents — and

inconsistent in significant respects with the testimony of Sergeant Ovando and Detective Rojas. Notwishstanding the internal inconsistencies in Sergeant Ovando's testimony, it is plain — and the Court finds — that he did not see anyone, let alone R.D., break for the back of the Apartment from the vicinity of the living room. On both his own and Detective Smyth's accounts, Sergeant Ovando was standing in a location that would have given him a clear view of R.D. if he had been where Detective Smyth claims. (Tr. 165-69, 203, 251, 310-13; GX 1A). Further, Sergeant Ovando testified that safety — and keeping all the civilians in the Apartment in front of him — was his "primary" concern. (Tr. 251, 290, 312). Yet he acknowledged that he did not remember "see[ing] a reason why [Detective Smyth] had gone running back" (Tr. 312); did not see "anything" down the hallway despite a clear view (Tr. 313); and had not previously seen the young male who allegedly returned with Detective Smyth, either in the foyer or otherwise. (Tr. 315, 319-20). Nor did Sergeant Ovando corroborate Detective Smyth's claim that he yelled "Stop, police!" several times as he chased R.D. down the hallway.

Although Detective Rojas was not in as good a position as Sergeant Ovando to see what, if anything, happened in the foyer and hallway, he too gave no indication of there being anyone other than Crespo, Custodio, their daughter, Delarosa, and Brian Garcia in or near the foyer when the police entered. Further, he testified that he had no recollection of anyone on his team "shout[ing] anything" or "command[ing] anyone to do anything, to stop, to go somewhere, anything of that sort." (Tr. 411). To be sure, Detective Rojas's testimony did corroborate Detective Smyth's story insofar as he testified that Detective Smyth returned from the back of

---

the officers' testimony about them at the hearing, which the Court did not find especially credible (in light of, among other things, a review of the CCRB materials themselves (GX 31-32)) — contribute to the Court's doubts about the credibility of the Government's witnesses. Even in the absence of evidence concerning these other incidents, however, the Court would not credit the claim that R.D. was present in the Apartment and made a break for Bedroom 1.

the Apartment with two males. (Tr. 405-06). But Sergeant Ovando did not corroborate that important detail (and Detective Rojas himself appeared to recant it on cross-examination). And in other respects — for instance, his claim that he sent Crespo with an officer to retrieve the person she said was in the back of the Apartment and his claim that the two males entered the living room together — Detective Rojas's testimony was itself fundamentally at odds with his partners' accounts. The bottom line is that, given Sergeant Ovando's superior vantage point (one that was closer to where R.D. allegedly stood and had a clear view of the hallway) and the officers' self-professed concerns for their safety, it is not credible that, if events took place as Detective Smyth described, they would not have either seen (and remembered) R.D. break for the back of the Apartment or heard (and remembered) Detective Smyth yell for him to stop.

Second, Detective Smyth's story about R.D. breaking down the hallway to the door of Bedroom 1 was contrary to Crespo's testimony and Fadul's sworn declaration that R.D. was not even present in the Apartment when the police arrived. To be sure, there are reasons to doubt their accounts, starting with their obvious bias. Not without force, the Government also challenges Crespo's testimony at the hearing by pointing to her seemingly contrary testimony before the grand jury on March 22, 2013. (Gov't Post-Hearing Br. (Docket No. 132) 12-13). That earlier testimony, the Government argues, is more believable because it took place "months before" the "key issue" of who was present in the Apartment on September 10, 2012, "had crystal[l]ized." (*Id.* at 13). Crespo's relevant grand jury testimony, however, is not quite as "clear and unequivocal" as the Government suggests. (*Id.*). Specifically, Crespo testified that her "brothers" plural were present when asked "[w]ho was present in the house *that day*," but she was never unambiguously asked whether they were present *when* the police arrived. (GX 33, at

31

Amendment is directed," *Payton*, 445 U.S. at 585 (internal quotation marks omitted), and because the danger inherent in being on another's turf does not "*ipso facto* justify a protective sweep," *Gandia*, 424 F.3d at 263, a court must be scrupulous in ensuring that a protective sweep is conducted "only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the . . . scene," *Buie*, 494 U.S. at 336. A court must be especially scrupulous where, as here, police officers contend that they were allowed entry in the first instance based on consent, as anything less would both enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search and undermine the well-established principle that a person can limit the scope of his or her consent to search to a particular area.

Here, for the reasons stated above, the police officers lacked an objectively reasonable basis to conduct a protective sweep. At a minimum, that requires suppression with respect to the moving Defendants of the evidence seized within the Apartment on or about September 10, 2012. Although Defendants suggest that it may warrant suppression of additional evidence as "fruit of the poisonous tree" (Defs.' Post-Hearing Br. (Docket No. 131) 25-27), whether or to what extent that is the case is not clear on the present record. *See, e.g., United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (stating that "to determine whether evidence is a fruit of a poisonous tree, a court must determine whether the government acquired the evidence by exploiting the illegal search or rather by a means sufficiently distinguishable from that search" and that "[t]he burden of showing admissibility rests on the prosecution"). Also unclear is whether suppression with respect to the moving Defendants calls for holding separate trials as to the moving and non-moving Defendants. Accordingly, all parties (that is, *both* the moving and non-moving Defendants alike) are directed to confer with respect to those questions and any

other implications of this Opinion and Order for the further proceedings to be conducted in this case, and to appear for a conference with the Court on **April 30, 2014**, at **3:45 p.m.**

The Clerk of Court is directed to terminate Docket Nos. 47, 57, and 59.

SO ORDERED.

Dated: April 18, 2014
       New York, New York

JESSE M. FURMAN
United States District Judge

Kenneth GARCIA #91977-054
Federal Correctional institution #2
P.O. Box 1500
Butner, N.C. 27509

91977-054
Court Clerk Of
500 Pearl ST
NEW YORK, NY 10007
United States

USM P3 SDNY